# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GABRIEL RODRIGUEZ, | ) 1:06-cv-01782 GSA |
| | ) |
| Plaintiff, | ) ORDER REGARDING PLAINTIFF'S |
| | ) SOCIAL SECURITY COMPLAINT |
| v. | ) |
| | ) (Documents 22 and 30) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## BACKGROUND

Plaintiff Gabriel Rodriguez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' cross motions for summary judgment, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

///

///

///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On November 19, 2007, the Honorable Oliver W. Wanger reassigned the case to the undersigned for all purposes.

1

# **FACTS AND PRIOR PROCEEDINGS**[2]

Plaintiff filed for SSI on May 14, 2004. AR 63-64. He alleged disability since March 15, 2004, due to seizures, asthma and developmental delays. AR 63-64, 71. After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 45-49, 51-57, 58. On April 19, 2006, ALJ Patricia Flierl held a hearing. AR 315-347. ALJ Flierl denied benefits on August 2, 2006. AR 9-18. On October 17, 2006, the Appeals Council denied review. AR 5-8.

Hearing Testimony

On April 19, 2006, ALJ Flierl held a hearing in Fresno, California. AR 315-347. Plaintiff appeared with his attorney, Melissa Proudian. AR 317.

Plaintiff was born on February 24, 1983, and was 23 at the time of the hearing. AR 317. He is single and does not have any children. AR 319. He lives with his uncle, his uncle's girlfriend and his cousin. AR 319. He does not have a driver's license and does not drive. AR 320-321.

Plaintiff testified that he completed the ninth grade. AR 321. He has not gone back to get a GED or diploma. AR 321. He went to vocational training for medical assisting in 2005, but did not finish because he could not do the math. AR 321-322. He has not tried any other courses. AR 322.

Plaintiff testified that he has worked and has "had about three jobs." AR 322. The longest job he had was working at a Burger King in Germany for two months where he did food prep. AR 322. He only worked two months because he was "moving back to the states." AR 322. He could not do the job at Burger King. AR 323. He was not as fast as everybody else. AR 323. He was not fired or reprimanded. AR 323. He quit. AR 323. If he had not quit, they "probably would have fired" him. AR 323. The boss told him all the time that he better speed up. AR 323. He understood what he was supposed to do at Burger King. AR 323. He could not

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1  remember the stuff he was supposed to make, so he would have somebody help him.  AR 323.
2  He got in trouble for that, too.  AR 323.
3     Plaintiff testified that he thought he could work.  AR 324.  There was "a lot of stuff" he
4  was scared to do, like working with money.  AR 324.  He is not fast at counting money.  AR 324.
5  He did not know if he was able to work, but would like to work.  AR 324.  He did not know if he
6  could do a job eight hours a day, five days week.  AR 324.
7     Plaintiff testified that he also worked at a lumber place stacking wood and at another
8  Burger King.  AR 324.  He stacked wood for a month or a month and a half.  AR 325.  He quit
9  and moved to Fresno.  AR 325.  They did not let him go, he just quit.  AR 325.  He could not
10  remember if he got in trouble at that job.  AR 325.  He was pulling apart spools, but could not do
11  it.  AR 325.  They switched him to stacking wood.  AR 326.  He could do the stacking.  AR 326.
12  The heaviest wood that he had to lift was ten pounds.  AR 326.  He had to ask questions about
13  where to put the wood.  AR 327.  His supervisor got upset at him for asking questions because he
14  would have to stop the machine.  AR 327.
15     Plaintiff testified that at the other Burger King he worked he did the same thing as the
16  first Burger King.  AR 327.  It was hard "keeping up making the sandwiches and remembering
17  how to make them."  AR 327.
18     Plaintiff testified that he has a seizure problem and asthma.  AR 327.  He previously had
19  a problem with drugs.  AR 327.  He always had problems at school.  AR 327.  He could not catch
20  up.  AR 327.  He could not learn like his other friends.  AR 327-328.  He was in regular classes
21  and they switched him to "special ed."  AR 328.  He switched to special ed at the end of ninth
22  grade.  AR 328.  He stopped going to school because he could not remember a lot of stuff.  AR
23  328.  It is hard for him to do homework.  AR 328.  He was in special ed for only one year.  AR
24  328.  He thought he was doing good in special ed.  AR 329.  He stopped going because he was
25  "just being dumb" and was sneaking out of school.  AR 329.
26     Plaintiff testified that the last time he had a seizure was a year or two before the hearing.
27  AR 329.  He does not know what type of seizure he has been diagnosed with.  AR 329.  The
28  doctors say it is seizure disorder.  AR 329-330.  He does not know if it is epilepsy.  AR 330.

1    Plaintiff testified that he does not have a doctor and has not had one in a long time
2 because he does not have insurance.  AR 330.  He now has appointments for the doctor.  AR 330.
3 He went to Community Medical last year.  AR 330-331.  He is on medication and taking it
4 regularly.  AR 331.  His uncle reminds him because he will forget.  AR 331.  He is taking
5 Tegretol.  AR 331.  He did not know if he was having side effects from it, but he cannot sleep.
6 AR 331.  He does not pay for the Tegretol.  AR 331-332.  The MISP insurance pays for it.  AR
7 332.
8    Plaintiff also thinks that he has depression as a side effect.  AR 332.  He gets "really,
9 really, really bad anxiety attacks."  AR 332.  He has not had any treatment for depression.  AR
10 332.  He tried to go to Fresno County Mental Health Outpatient within the two years prior to the
11 hearing.  AR 332.  He told them the problems he was having and they sent him to talk to
12 somebody.  AR 333.  They looked in the phone book and then he left.  AR 333.
13    Plaintiff testified that he was kept overnight at Community Hospital for depression.  AR
14 333.  He was feeling suicidal because his life was going nowhere and it was hard for him to find
15 a job because of his seizures.  AR 333.  People would not hire him.  AR 333.
16    Plaintiff testified that physical insecurity is a problem for him.  AR 334.  It is one of the
17 reasons why he will not look for work.  AR 334.  He would rather avoid work because of
18 physical problems and the possibility of having a seizure.  AR 334.  He gets weird when people
19 look at him.  AR 334.  If he cannot do his job right, he gets really nervous.  AR 334.  He is
20 "afraid to go into an anxiety attack."  AR 334.  He does not have medication and has not seen a
21 doctor for it.  AR 334.
22    Plaintiff testified that he had a small anxiety attack the day before the hearing.  AR 334.
23 He had not seen his friends and was feeling weird seeing them again.  AR 334.  He got nervous
24 and shaky, but did not want to show that he was nervous.  AR 334.  When he gets an anxiety
25 attack, he starts to get shaky.  AR 334.  Sometimes his voice will start shaking and sometimes he
26 will stay quiet so nobody knows.  AR 334.  He will try to calm himself down.  AR 335.  Inside he
27 is scared, really scared.  AR 335.  His anxiety attacks can happen every two or every three days.
28 AR 335.

     Plaintiff testified that he has not tried to go back to Mental Health to get medication. AR 335. He is "kind of scared taking medication" because he does not want it to "mess with" him. AR 336. He had a problem with illegal drugs. AR 336. The last time he took illegal drugs was six to eight months prior to the hearing. AR 336. He was using methamphetamine three times a week. AR 336. He had been using it for a year or less and stopped on his own. AR 336. He cloud not deal with it. AR 336. He did not have side effects from stopping. AR 337. It did not help him feel less depressed or less anxious. AR 337.

     Plaintiff testified that his memory is "really, really bad, bad." AR 337. He has different types of seizures. AR 338. He has little tiny ones that happen even when he is taking his medication. AR 338. The small ones happen almost daily. AR 338. Right before he has one, he gets a tickle inside his head. AR 338. After the small seizures, he feels really scared. AR 339. They last two seconds, but sometimes there are three in a row. AR 339. Those are the ones that really scare him. AR 339. After the small seizures he cannot walk. AR 339. His legs are weak. AR 339. He gets cuts in his mouth and sometimes on his tongue. AR 339. He cannot open his jaw. AR 339. It happens every time because everything locks up. AR 340. His muscles get "almost hard as a rock." AR 340. He always has had small seizures. AR 340. He has not had a steady doctor to tell about his symptoms. AR 340. After a big seizure, he has headaches, cuts in his mouth, he cannot open his jaw and he cannot walk. AR 340. After a small seizure, he just gets scared. AR 341. The lock, the cuts and the inability to move his jaw are after a big seizure. AR 341. The little seizures scare him because he thinks he is going to go into a seizure. AR 341. The feeling of being scared last about 30 minutes, sometimes less. AR 341. He has these every two to four days, at least one a day. AR 342. The most small seizures he might have in a day is seven. AR 342. He did not know the last time he had seven small seizures. AR 342. The small ones are hard to remember. AR 342. If he had seven small seizures in a row, he would not go to the emergency room because they would probably just tell him to take his medication and send him home. AR 342.

     Plaintiff testified that it sometimes is hard to concentrate. AR 343. He will forget what he is talking about. AR 343. He thinks he could concentrate for 30 to 45 minutes at a time. AR

343. He thinks he could concentrate for two hours at a time. AR 343. On certain things, like reading, he could not concentrate for two hours. AR 343. When he was at Burger King, he kept his attention, but could not keep the pace. AR 344.

Plaintiff testified that he has problems being around extreme temperature due to his asthma. AR 344. Sometimes cleaning solvents trigger his asthma because they are too strong. AR 345. He could not make the fries at Burger King because it was too hot and it would trigger the asthma. AR 345. Plaintiff testified that he thinks he could work in a structured setting where pace was not important. AR 345. He has not thought about going to vocational rehab or California State Vocational Rehabilitation. AR 346.

<u>Medical Evidence</u>

On February 9, 1994, Plaintiff underwent a special education psychoeducational evaluation in the fourth grade, which was completed by the multidisciplinary assessment team from the Sutter County Superintendent of Schools Office. AR 225-232a. Following a battery of tests, the evaluation indicated that Plaintiff was functioning within the "borderline" range of cognition when compared to same-aged peers. AR 232.

In March 1994, Plaintiff was found not eligible for special education services by the Sutter County Special Education Local Plan Area ("Sutter County SELPA"). AR 247. However, Plaintiff's Individualized Education Program team felt that Plaintiff needed "RSP" support to succeed. AR 247.

In June 1996, Plaintiff was found not eligible for special education services by the Sutter County SELPA. AR 241-242. Although Plaintiff's present levels of performance in reading, math and writing were below average, he did not have a discrepancy between his ability and achievement to be eligible for special education services due to a specific learning disability. AR 241.

On December 30, 2001, Plaintiff sought emergency treatment at University Medical Center following a "full body seizure." AR 310.

On April 3, 2002, Plaintiff sought follow-up treatment for his seizures at University Medical Center. AR 309.

On July 29, 2002, Plaintiff sought a medication refill at University Medical Center prior to a trip to Germany for 6-8 months.  AR 308.

On May 19, 2004, Plaintiff underwent an EEG, which was abnormal for paroxysmal slowing with rare predominantly left frontotemporal sharp activity.  AR 180.

On May 20, 2004, Don Yoshimura, M.D., conducted a neurology consultation.  AR 177-179.  Plaintiff reported having two seizures per year that typically occurred during periods of erratic medication use or the use of amphetamines.  AR 177.  At the time of the examination, Plaintiff had been off of all medications for approximately one year due to money issues.  AR 177.  Dr. Yoshimura opined that Plaintiff had probable complex partial seizures with rapid secondary generalization with breakthroughs "likely precipitated by amphetamine use, medication non-compliance."  AR 177.  Dr. Yoshimura prescribed Tegretol.  AR 177.

On June 7, 2004, Plaintiff was taken to the hospital on a "5150" following ingestion of approximately 30 Depakote tablets to kill himself.  AR 137-138, 150-168.  Plaintiff reported being depressed, feeling worthless and hopeless.  AR 157.  On that same date, Plaintiff was discharged to PACT.   AR 145-147.

On June 8, 2004, Plaintiff underwent a crisis assessment by Fresno County Human Services after being stressed out and taking pills.  AR 130-133.  Victoria Hellenas, MS, conducted a mental status examination.  AR 131.  On examination, Plaintiff had a reflective mood and broad affect.  AR 131.  His memory and judgment were intact and comprehension adequate.  AR 131.  He denied suicidal or homicidal ideations.  AR 131.  Ms. Hellenas diagnosed Plaintiff with "Depressive D/O NOS R/O Dysthymia" and borderline intellectual functioning.  AR 132.  He was assigned a Global Assessment of Functioning of 55.  AR 132.  Plaintiff also was assessed by a physician.  AR 134.  During the assessment, Plaintiff reported that he felt worthless because he had to move back in with his mother and he could not find work.  AR 134.  Plaintiff was discharged from PACT on June 8, 2004.  AR 126-128.

On June 27, 2004, Plaintiff sought emergency room treatment for seizures.  AR 172-176.  Plaintiff reported that he ran out of Tegretol.  AR 172.

On July 20, 2004, Richard Engeln, Ph.D., a clinical psychologist, completed a consultative psychological evaluation of Plaintiff. AR 182. On evaluation, Plaintiff was alert and oriented. AR 184. His verbal expression was easily understood and appropriate in form and association. AR 184. Dr. Engeln administered the following psychological tests: Wechsler Adult Intelligence Scale III ("WAIS-III"), Wechsler Memory Scale III and the Bender-Gestalt test. AR 182. On the WAIS-III, Plaintiff achieved a verbal IQ score of 82, a performance IQ score of 70 and a full scale IQ score of 75. AR 184. Dr. Engeln opined that Plaintiff's intellectual measurements were low average in verbal intelligence and low borderline range in visual intelligence. AR 184.

During the interview with Dr. Engeln, Plaintiff presented with no evidence of any mental or emotional illness. AR 185. Dr. Engeln diagnosed Plaintiff with adjustment response to medical-physical issue of seizure disorder, with low medication compliance. AR 185. Plaintiff also had a non-clinical diagnosis reflecting phase of life transition. AR 186. Dr. Engeln opined that Plaintiff was verbally, cognitively and socially capable of job adjustment "in a context where instructions are unidimensional and normal supervision is provided." AR 186. Dr. Engeln further opined that Plaintiff's concentration and social skills were adequate for work adjustment and his verbal, cognitive and social skills were adequate for entry level job adjustment in a setting consonant with education, age and past job placements. AR 186. Dr. Engeln further opined that Plaintiff was able to perform one-to-two step simple job instructions, but he was not able to receive complex or technical job instructions. AR 186.

On September 8, 2004, state agency physician Evelyn Aquino-Caro, M.D., completed a Mental Residual Functional Capacity Assessment form. AR 192-195. Dr. Aquino-Caro opined that Plaintiff was moderately limited in th ability to understand and remember detailed instructions and in the ability to carry out detailed instructions. AR 192. Plaintiff was not significantly limited in any other areas of understanding and memory, sustained concentration and persistence, social interaction or adaption. AR 192-193.

On September 8, 2004, Dr. Aquino-Caro also completed a Psychiatric Review Technique form. AR 209-222. Dr. Aquino-Caro determined that Plaintiff had a history of academic delay,

which was a medically determinable impairment that did not precisely satisfy the diagnostic criteria of an organic mental disorder. AR 210. Plaintiff also had an adjustment disorder that did not precisely satisfy the diagnostic criteria of an affective disorder. AR 212. Dr. Aquino-Caro opined that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence or pace. AR 219. On December 3, 2004, Evangeline Murillo, M.D., reviewed and affirmed Dr. Aquino-Caro's assessment as written. AR 209.

On September 9, 2004, Dr. Sharbough, a state agency neurologist, completed a Physical Residual Functional Capacity Assessment form. AR 196-203. Dr. Sharbough opined that Plaintiff did not have any exertional, postural, manipulative, visual or communicative limitations. AR 197-200. Plaintiff had environmental limitations to avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation and to avoid concentrated exposure to hazards (machinery, heights, etc.) as seizure and asthma precautions. AR 200. On December 1, 2004, James V. Glaser, M.D., reviewed and affirmed Dr. Sharbough's assessment as written. AR 203.

On September 27, 2004, Plaintiff saw Dr. Yoshimura. AR 236. Dr. Yoshimura opined that Plaintiff's seizures were better controlled on a subtherapeutic dose of Tegretol. AR 236.

On November 16, 2004 and January 10, 2005, Plaintiff sought a refill of his seizure medication in the emergency services department of University Medical Center. AR 276-279, 281-285. Plaintiff also sought a medication refill of his Tegretol on April 8, 2005. AR 270-272. Plaintiff denied any complaints. AR 272.

On February 20, 2005, Plaintiff sought emergency treatment for shortness of breath. AR 275.

On July 29, 2005, Plaintiff sought treatment at University Medical Center for a seizure and vomiting. AR 263-264. Treatment notes indicted ETOH and crystal meth use the previous night. AR 263-264.

ALJ's Findings

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since March 15, 2004, his alleged onset date. AR 13. The ALJ found that Plaintiff had severe

impairments of seizure disorder, asthma and borderline intellectual functioning, but he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 13-14. The ALJ further found that Plaintiff had the residual functional capacity to work without exertional limits, but must avoid pulmonary irritants, working around unprotected heights, driving automotive equipment or working around dangerous moving machinery. AR 14. Plaintiff could perform simple, repetitive, one- to two-step job tasks. AR 14. Therefore, the ALJ concluded that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform and that Plaintiff was not disabled. AR 18.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means more than a mere scintilla, Richardson v. Perales, 402 U.S. 389, 401 (1971), but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (internal quotation marks and citation omitted). The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. E.g., Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the correct legal standards, and if the Commissioner's findings are supported by substantial evidence. See Sanchez v. Sec'y of Health and Human Serv., 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which

1 has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 416.920 (a)-(g) (2006). Applying the evaluation process in this case, the ALJ found that Plaintiff (1) has not engaged in substantial gainful activity since the alleged onset of disability; (2) has an impairment or a combination of impairments that is considered "severe" (seizure disorder, asthma and borderline intellectual functioning) based on the requirements in the Regulations (20 C.F.R. § 416.920(c) (2006)); (3) does not have an impairment or combination of impairments that meets or equals one of the impairments set forth in Appendix 1 to Subpart P of Part 404; (4) does not have past relevant work; but (5) can perform jobs that exist in significant numbers in the national economy.

Plaintiff argues that the ALJ erred by not obtaining the testimony of a vocational expert based on his severe mental impairment and his limitation to simple, one- and two-step tasks.

## DISCUSSION

A.  Vocational Expert Testimony

    1.  *Use of Medical-Vocational Guidelines*

The parties do not dispute the ALJ's determination at steps one through four. Instead, the dispute centers around the ALJ's step-five determination. Plaintiff asserts that his borderline intellectual functioning was a significant non-exertional limitation and therefore the ALJ erred at step five by relying on the Medical-Vocational Guidelines ("the grids") and failing to elicit expert testimony.

To assist in the step-five determination, the Social Security Administration established the Medical-Vocational Guidelines ("the grids"), which "consist of a matrix of...four factors... physical ability, age, education, and work experience-and set forth rules that identify whether jobs requiring a specific combination of these factors exist in significant numbers in the national economy." *Heckler v. Campbell*, 461 U.S. 458, 461-462 (1983). An ALJ may rely on the grids when a non-exertional limitation is alleged because the grids "provide for the evaluation of claimants asserting both exertional and nonexertional limitations." *Razey v. Heckler*, 785 F.2d 1426, 1430 (9th Cir. 1986). Conversely, an ALJ may not rely on the grids "[w]hen a claimant's non-exertional limitations are 'sufficiently severe' so as to significantly limit the range of work permitted by the claimant's exertional limitations." *Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988)(citation omitted). Plaintiff reasons that since the ALJ determined that his mental impairment was severe at step two, then it must constitute a significant non-exertional impairment at step five such that the assistance of a vocational expert was required. Plaintiff's argument lacks merit.

The fact that the ALJ found Plaintiff to have a severe non-exertional impairment at step two (borderline intellectual functioning) does not automatically require the use of a vocational expert at step five. The step two and the step five determinations require different levels of severity of limitations such that "the satisfaction of the requirements at step two does not automatically lead to the conclusion that the claimant has satisfied the requirements at step five." *Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007). As explained by the Ninth Circuit in *Hoopai*,

> Clearly, the severity of the limitations at step five that would require use of a vocational expert must be greater than the severity of impairments determined at step two, otherwise the two steps would collapse and a vocational expert would be required in every case in which a step-two determination of severity is made. This would defeat the purpose of the grids because a claimant could not reach the step five determination without making out a prima facie case of a severe disability at step two.

*Id*. at 1076.

The rule of *Hoopai* applies in this case such that the step two finding of a severe mental impairment (borderline intellectual functioning) does not automatically require the testimony of a vocational expert at step five.

Plaintiff also contends that because the grids apply only to exertional factors, the ALJ was required to obtain vocational expert testimony. As previously noted and indicated by the Ninth Circuit in *Hoopai*, however, "[a] vocational expert is required only when there are significant and 'sufficiently severe' non-exertional limitations not accounted for in the grid." *Hoopai*, 499 F.3d at 1076. Accordingly, the dispositive issue is the severity of the non-exertional impairment at step-five. In assessing the Plaintiff's RFC, the ALJ considered physician opinions, lay witness statements, Plaintiff's complaints and evidence of Plaintiff's daily activities. AR 14-17. The ALJ concluded that Plaintiff was able "to work without exertional limitations, with seizure and pulmonary precautions, and a mental limitation to simple, repetitive tasks." AR 16. The ALJ then determined that Plaintiff's non-exertional limitations would not limit his ability to perform unskilled work. AR 18. Plaintiff does not refer the court to evidence indicating that Plaintiff's mental impairment was sufficiently severe to warrant vocational expert testimony. Further, the record reflects that Plaintiff was able to work, but left positions at Burger King and at a lumber place because he moved and not because of any non-exertional limitations.

Plaintiff also argues that a limitation to one- and two-step tasks requires vocational expert testimony. To support his argument, Plaintiff contends that a Dictionary of Occupational Titles ("DOT") reasoning level of one[3] equates with his limitation to one- and two-step tasks, and thus a VE was needed to determine erosion of the unskilled occupational base of jobs due to such a limitation. Defendant disagrees and argues that unskilled work exists in the national economy that requires little or no judgment to do simple duties.

As stated above, if a claimant's non-exertional limitations "significantly limit the range of work" he can perform, mechanical application of the grids is inappropriate and a vocational expert would be needed to describe what, if any, jobs existed in the national economy that the

---

[3] The DOT assigns General Educational Development reasoning levels 1-6 to jobs representing reasoning, math and language skill levels.

13

claimant could perform. *Desrosiers v. Secretary of Housing and Health Services*, 846 F.2d 573, 577 (9th Cir. 1988). The determination of whether a non-exertional limitation significantly limits the range of work the claimant is able to perform is left to the ALJ. *Id.*

Here, rather than hear testimony from a VE to determine the effect of Plaintiff's non-exertional limitations on the occupational base, the ALJ determined that the limitations did not significantly limit the range of work Plaintiff could perform and applied Rule 204.00 of the grids to find Plaintiff not disabled. The ALJ reasoned that Plaintiff's limitations had "little effect on the occupational base of unskilled work at all exertional levels." AR 18.

Pursuant to *Desrosiers*, the ALJ determined that a limitation to simple, repetitive, one- and two-step tasks, where Plaintiff could perform work at all exertional levels, did not significantly erode the occupational base to preclude reliance on the grids. Such a conclusion is certainly logical given that Plaintiff could perform unskilled work at *every* exertional level. This is not a situation involving a claimant who is limited to one exertional level. In such a circumstance, the need for VE testimony would be more apparent, as a nonexertional limitation where the claimant can only perform work at one exertional level may cause a significant erosion of the occupational base.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Gabriel Rodriguez.

IT IS SO ORDERED.

**Dated:   August 3, 2008**          /s/ **Gary S. Austin**
                                    UNITED STATES MAGISTRATE JUDGE

14